## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-2221-REB-CBS

BOB ALLEN CUSTARD,

                Plaintiff,

v.

BALSICK, *et al.*,

                Defendants.

## ORDER AND RECOMMENDATION

Magistrate Judge Craig B. Shaffer

      The court has before it the Defendants'[1] motion (doc. #44) to dismiss Plaintiff Bob

Custard's amended complaint, doc. #9 (referred to as the Amended Complaint or "AC").  The

court also has before it Plaintiff's motion (doc. #76) for a ruling on the motion to dismiss.

Pursuant to the Order Referring Case dated January 22, 2016 (doc. #21) and the memorandum

dated April 6, 2016 (doc. #45), this matter was referred to the Magistrate Judge.  For the

following reasons, the court recommends that the Defendants' motion to dismiss be granted in

part and denied in part.  Plaintiff's motion for a ruling is denied as moot.

### BACKGROUND

      In his Amended Complaint (doc. #9) filed on November 12, 2015, Plaintiff — a *pro se*

prisoner in the custody of the Bureau of Prisons at the United States Penitentiary Administrative

Maximum ("ADX") — sued numerous prison officers, prison medical staff, the Federal Bureau

of Prisons ("BOP"), and the United States.  In an Order dated January 22, 2016, Judge Lewis T.

---

[1] The Motion is brought on behalf of all of the Defendants except Defendants MacGrath, Haygood, and Does 1-10, for whom the record does not reflect personal service.

Babcock dismissed several claims as frivolous under D.C.Colo.LCivR 8.1 and 28 U.S.C. §

1915A.  Doc. #19.  Plaintiff's claims that survived that order are as follows:

| *Claim* | *Legal Theories* | *Defendants* |
|---|---|---|
| 1: Plexiglas incident | Excessive force – Eighth Amendment | Balsick |
| | Delay in medical care – Eighth Amendment | Balsick, Melvin, MacGrath, Haygood |
| 2: Chemical gas incident | Excessive force – Eighth Amendment | Martin; Does 1-10 |
| | Denial in medical care – Eighth Amendment | Osagie; Santini |
| | Retaliation – First Amendment | Martin, Does 1-10; Osagie and Santini in their official capacities for declaratory and injunctive relief. |
| 3: Cell 208 shower | Indifference to serious risk of harm – Eighth Amendment | Melvin, Martin, MacGrath, Hess, Belter, McMullen, Behle, Espinosa |
| | Delay in medical care – Eighth Amendment | Osagie |
| | Retaliation – First Amendment | Martin, Melvin, Hess, Belter, Behle, Espinosa, and MacGrath in their official capacities for declaratory and injunctive relief. |
| [4]: Declaratory and injunctive relief | Associated with the constitutional claims | BOP |
| [5]: Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674 | Torts under Colorado law associated with the constitutional claims | United States |

Each of the Eighth Amendment claims against the prison officers seeks damages in their

individual capacities pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics*,

403 U.S. 388 (1971).  Relevant to Claims 2 and 3, the court takes judicial notice pursuant to

Federal Rule of Evidence 201 that in one of his other pending cases, *Custard v. Armijo, et al.,* Civ. 15-448-REB-CBS, Mr. Custard brought quite similar allegations from his April 2014 stay in SHU.[2]  In that case, Mr. Custard alleged among other things, second-hand chemical gassing, a dangerous condition and injury resulting from jagged shower welds and a slippery floor; being falsely labeled a "snitch;" and FTCA liability for failure to provide adequate medical care. *Armijo,* Civ. 15-448, Doc. # 72 at pp. 9, 12, 15 (Recommendation of this court dated February 10, 2016), *adopted*, Doc. #75.  In light of the similarities, the court takes significant guidance from the recommendation and orders in *Armijo*.

ANALYSIS

I.     *Legal Standards for Federal Rule of Civil Procedure 12(b)(6) Motions to Dismiss*

Rule 12(b)(6) states that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." … A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. ... The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  Well-pled factual assertions are accepted as true at this phase; conclusory assertions are not. *Iqbal,* 556 U.S. at 679.  In the Tenth Circuit, the *Twombly/Iqbal* standard

> is a middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or formulaic recitation of the elements of a cause of action, which the Court stated will not do.  In other words, Rule 8(a)(2) still lives.... Under Rule 8, specific facts

---

[2] The court can take judicial notice of pleadings in other court cases as public records without converting the motion to dismiss to summary judgment.  *Tal v. Hogan,* 453 F.3d 1244, 1264 n.24 (10th Cir. 2006); *Gee v. Pacheco,* 627 F.3d 1178, 1186 (10th Cir. 2010).

are not necessary; the statement need only give the defendant fair notice of what the ... claim is and the ground upon which it rests.

*Pueblo of Jemez v. United States,* 790 F.3d 1143, 1172 (10th Cir. 2015) (internal brackets omitted).  "Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Pueblo of Jemez*, 790 F.3d at 1172.  The court must construe the fact allegations and any reasonable inferences from them in the light most favorable to the non-moving party.  *Sanchez v. Hartley,* 810 F.3d 750, 754 (10th Cir. 2016).  "Thus, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely." *Id.* at 756 (quoting *Twombly*, 550 U.S. at 556).  However,

> [n]owhere in the law does context have greater relevance to the validity of a claim than prisoner civil-rights claims. … [A] prisoner claim will often not be plausible unless it recites facts that might well be unnecessary in other contexts.  For example … a prisoner claim may not be plausible unless it alleges facts that explain why the usual justifications for the complained-of acts do not apply.

*Gee v. Pacheco*, 627 F.3d 1178, 1185 (10th Cir. 2010).

Because Plaintiff is proceeding *pro se* and is not an attorney, his "pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers."  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)).  "[I]f the court can reasonably read the pleadings to state a claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements."  *Hall,* 935 F.2d at 1110.  But the court also cannot be a *pro se* litigant's advocate, and "*[p]ro se* status 'does not excuse the obligation of any litigant

to comply with the fundamental requirements of the Federal Rules of Civil … Procedure.'"

*Yang v. Archuleta*, 525 F.3d 925, 927 n. 1 (10th Cir. 2008).

The *pro se* plaintiff must provide a simple and concise statement of his claims and the

specific conduct that gives rise to each asserted claim. *See Willis v. MCI Telecomms.*, 3 F. Supp.

2d 673, 675 (E.D.N.C. 1998), *aff'd*, 161 F.3d 5 (4th Cir. 1998).  The court cannot "supply

additional factual allegations to round out a plaintiff's complaint." *Whitney v. New Mexico*, 113

F.3d 1170, 1173-74 (10th Cir. 1997).  Nor may a plaintiff avoid dismissal by alluding to facts

that have not been alleged, or by suggesting violations that have not been pled. *Associated Gen.

Contractors of Cal. Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).  Except

for matters suitable for judicial notice and certain exceptions inapplicable here, "[g]enerally, the

sufficiency of a complaint must rest on its contents alone." *Gee,* 627 F.3d at 1186.[3]

## II.     Identification of and Service to Defendants John Does 1-10, MacGrath and Haygood

The court begins its analysis with the Defendants who have not been served.  Defendants

argue that the individuals named only anonymously as John Does should be dismissed under

Rule 12(b)(5) for failure to identify and serve them within the 90 days provided by Rule 4(m).

Doc. #44 at p. 8.  The Tenth Circuit recognizes that there is no provision in the Federal Rules of

Civil Procedure for naming of fictitious or anonymous parties in a lawsuit. *Watson v. Unipress,

Inc.*, 733 F.2d 1386, 1388 (10th Cir. 1984); *Coe v. U.S. Dist. Court*, 676 F.2d 411, 415 (10th Cir.

1982).  Yet as Judge Blackburn held in this case, many courts permit

> bring[ing] an action against unknown John Doe defendants, but *plaintiff* must
> substitute named defendants for those unknown defendants after the completion
> of discovery. … [W]here the identity of alleged defendants will not be known
> prior to the filing of a complaint . . . plaintiff should be given an opportunity

---

[3] Plaintiff attached documents to his response brief (doc. #56-1 through 5) that do not appear to
be subject to either judicial notice or any other exception that would permit the court to consider
them on a Rule 12(b)(6) motion without converting to summary judgment.  The court does not
consider those documents.

> through discovery to identify the unknown defendants.  This obligation is coextensive with plaintiff's burden under Fed. R. Civ. P. 4(m) to effectuate proper service.

Doc. #38 at p. 2 (February 25, 2016 order, quotation marks omitted).

Unless Plaintiff shows good cause for an extension, he must complete personal service to each Defendant within the time permitted by Rule 4(m): presently, 90 days after filing the complaint, and at the time that Plaintiff filed his complaint, 120 days.  Fed. R. Civ. P. 4(m). Plaintiff filed the amended complaint on November 12, 2015.  Doc. #9.  Even measuring Rule 4(m)'s time period from the date that Judge Babcock completed the initial review under 28 U.S.C. § 1915A (January 22, 2016), that time period passed on May 23, 2016.

Plaintiff has not sought an extension of time to identify and serve the Doe Defendants.  In his response, Plaintiff includes in a single sentence that he "moves [the] court [to] order service of complaint on" the Doe Defendants.  Doc. #56 at p. 22.  "A motion shall not be included in a response or reply to the original motion.  A motion shall be filed as a separate document." D.C.COLO.LCivR 7.1(d).  The court also already denied Plaintiff's earlier request to order service to the Does as "premature before the John Doe Defendants are identified.  The court and Defendants are not required to deduce the identity of John Doe Defendants from the limited information that is currently in the record."  Doc. #34.

As Judge Blackburn noted, "Plaintiff appears to believe that it is the court's obligation to identify unnamed John Doe defendants.  It is not."  Doc. #38 at p. 2.  "A plaintiff must cooperate with the Marshals Service and take reasonable steps to identify the defendant by name and address so that service can be accomplished."  *Nichols v. Schmidling,* No. 10-2086-JAR, 2012 WL 10350, at *2 (D. Kan. Jan. 3, 2012), *aff'd sub nom. Nichols v. Kan. Dep't of Corr.,* 503 F.

App'x 573 (10th Cir. 2012).  Because he is not proceeding *in forma pauperis,*[4] Plaintiff's

responsibility to identify the Defendants is greater than in most *pro se* cases.  *York v. Fed. Bur.*

*Of Prisons*, No. 07-cv-01297-EWN-KLM, 2008 WL 2410416, at *1–2 (D. Colo. June 11, 2008)

("As Plaintiff is neither proceeding *in forma pauperis* nor a seaman, the decision whether to

order the U.S. Marshal to serve the Summons and Complaint is left to the sound discretion of the

Court," citing Fed. R. Civ. P. 4(c)(3); *Brewer v. Ray,* 181 F. App'x 563, 566 (7th Cir. 2006)).

Here, the court authorized service by the Marshals, but "it is generally Plaintiff's burden, not

Defendant BOP's, to provide sufficient identifying information for the U.S. Marshal to serve"

the defendants.  *Id.*

Despite Plaintiff's responsibility to identify each Defendant, the court has no record of

Plaintiff having taken any steps to discover the Doe Defendants' identities and serve them.

There is no record of Plaintiff issuing early requests for documents (Fed. R. Civ. P. 26(d)(2) and

34(b)(2)(A)), developing a discovery plan (Rule 26(f)), or requesting a scheduling order.[5]  Rule

4(m)'s 120 days have long since passed.  However,

> even if good cause is not shown, a court has discretion under Rule 4(m) to extend
> the time allowed for service of process. * * * The Tenth Circuit has cautioned that
> a district court should not dismiss a *pro se* plaintiff's complaint for failure to
> effect proper service without first providing … specific instructions on how to
> correct the defects in service.

*Nichols*, 2012 WL 10350, at *2 (footnote omitted, citing *Olsen v. Mapes*, 333 F.3d 1199, 1204-

05 (10th Cir. 2003)).  The court permits Plaintiff 60 days from Judge Blackburn's ruling on any

objections to this order (or if there are no objections, then within 60 days of the objections

---

[4] Since at least January 2008, Plaintiff has been subject to the three-strikes limitation of 28
U.S.C. § 1915(g) and thus is prohibited from filing *in forma pauperis* unless he is "under
imminent danger of serious physical injury."  *See, e.g.,* Civ. 16-885-LTB, Doc. #4 (Order, Apr.
20, 2016).

[5] Pursuant to Rule 16(b)(2), the court finds good cause for delaying the scheduling order pending
the motion to dismiss.  The motion raised several significant legal issues, based on which this
court recommends narrowing the claims in ways that significantly narrow the scope of discovery.

deadline passing), in which to discover the Doe Defendants' identities and file a motion to amend the AC to name them.  If after this time period Plaintiff fails to allege sufficient facts to identify these individuals or to show good cause for delay in serving them, Defendants may renew their motion.  *See, e.g., Allen v. Zavaras*, 483 F. App'x 411, 412 n.1 (10th Cir. 2012); *Jones v. Mozer,* No. 11-cv-02189-PAB-MEH, 2012 WL 3778333, at *1 n.1 (D. Colo. Aug. 30, 2012).

Defendants also argue that Plaintiffs' claims against Mr. MacGrath should be dismissed because the docket does not reflect timely service to him.  Doc. #44 at p. 8.  BOP was "unable to identify" this defendant.  Doc. #36 at p. 2; Doc. #44 at p. 8.  Plaintiff responds that regardless of whether he spelled the name correctly, BOP should check other spellings and asserts that he has "more than sufficiently identified" this defendant by his conduct and statements on a particular date.  Doc. #56 at p. 21.  BOP "checked for alternative spellings."  Doc. #61 at p. 2.  As with the Does, Plaintiff has not sought an extension of time to identify and serve MacGrath.  In his response, Plaintiff instead requests an order that BOP's staff attorney Clay Cullen Cook shall identify and serve MacGrath.  Doc. #56 at p. 21.  Again, it is Plaintiff's responsibility to do so, not BOP's.  Nonetheless, for the same reason as with the Does, the court permits Plaintiff the same time period as for the Does, in which to identify the individual whom he named as MacGrath and provide sufficient information to enable the Marshals to serve him.

Defendants further argue that the claims against Mr. Haygood should be dismissed for Plaintiff's failure to serve him.  Haygood has retired from BOP.  Doc. #36 at p. 2, Doc. #44 at p. 8.  Plaintiff must still serve Haygood, but "security concerns … arise when prisoners have access to the personal addresses of former or current prison employees."  *Leek v. Thomas,* No. 09-3036-SAC, 2009 WL 2876352, at *2 (D. Kan. Sept. 2, 2009) (quotation marks omitted).  Within 10

8

days of this order, BOP shall file Haygood's last known address as Level 3 restricted (*i.e.,* restricted such that only the court will have access) for the Marshals to attempt service.

III.     *Claim One: Plexiglas Incident.*

In Claim One, Plaintiff asserts that Balsick violated the Eighth Amendment's protection against "cruel and unusual punishments" by using excessive force, and that Balsick, Melvin, MacGrath, and Haygood violated the Eighth Amendment by deliberate indifference to serious medical needs that arose from that use of force. As the court has summarized previously, Plaintiff alleges that

> [O]n March 9, 2015, while he was reviewing his personal property in the presence of Defendants Balsick and MacGrath, he pointed out that the Defendant were not wearing BOP-required name tags and that MacGrath was smoking inside a federal building. The Defendants responded by "screaming" at Plaintiff that they were now "at war" with him. (ECF No. 9 at 8). Defendant Balsick then began to hit his nightstick against a plexiglas partition, breaking it apart and "sending small sharp pieces of the plexiglas into [Plaintiff's] eyes, . . . nose & mouth," causing his right eye to bleed. (*Id.*). When Mr. Custard then took a piece of the shard out of his eye and attempted to hand it to Balsick through the plexiglas wall slot, the Defendant "slammed the heavy slot shut on [Plaintiff's] left hand," breaking bones in two of Plaintiff's fingers, and lacerating a third. (*Id.*). Defendants Balsick and MacGrath laughed hysterically at Plaintiff's injuries, and told Plaintiff that they hoped "[he] lost the two fingers" and "that's what happens when you f--- with us." (*Id.* at 9). Defendants Balsick and MacGrath instructed the medical department not to treat the Plaintiff's injuries, and Defendant Osagie, a physician's assistant, thereafter refused to provide Plaintiff with any medical treatment for 30 days after the incident. (*Id.*).
>
> Mr. Custard further alleges that when he reported the assault to Defendant Melvin, an ADX Lieutenant, Melvin responded "I am not going to do a darn thing! Don't piss them off and they won't beat you up." (*Id.*). Defendant Haygood, an ADX counselor, told Mr. Custard that he should stop filing lawsuits and grievances if he did not want to get beat up. (*Id.*). Defendants Melvin and Haygood also refused to contact medical staff to treat Plaintiff's injuries.
>
> Mr. Custard asserts that Defendants Balsick, MacGrath, Haywood and Melvin … violate[d] his First Amendment right to be free from unlawful retaliation, his Eighth Amendment right to be free from the use of excessive force, and his Eighth Amendment right to receive adequate medical care.

Doc. #19 at pp. 2-3. The court first addresses the alleged excessive force and then the alleged deliberate indifference to a serious medical need.

A.      Excessive Force

"The use of excessive force by jail officials violates a prisoner's rights under the Eighth

Amendment's Cruel and Unusual Punishments Clause when the prisoner is subjected to an

'unnecessary and wanton infliction of pain.'" *Miller v. Glanz*, 948 F.2d 1562, 1566 (10th Cir.

1991) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).  The court's inquiry must focus on

whether force was applied in a good faith effort to maintain or restore discipline, *see, e.g.,*

*Mitchell-Pennington v. McGovern*, No. 09-3106-SAC, 2009 WL 1938979, at *3 (D. Kan. Jul. 6,

2009) or "whether the force applied was excessive under the circumstances, or malicious and

sadistic." *Merritt v. Hawk*, 153 F. Supp. 2d 1216, 1224 (D. Colo. 2001).  *Cf. Marshall v.*

*Milyard*, 415 F. App'x 850, 852 (10th Cir. 2011) (observing that "[a]n action by a prison guard

may be malevolent yet not amount to cruel and unusual punishment"); *Pena v. Greffet*, 108 F.

Supp. 3d 1030, 1033 (D. N.M. 2015) ("The Eighth Amendment does not require officers to use

the minimum force necessary or even reasonably proportional force, but, rather, it requires only

that they refrain from 'malicious and sadistic' violence, and that they direct their efforts to

achieving a sincere penological end," quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).  The

court's Eighth Amendment analysis must take into consideration the highly-charged prison

environment.  *See Sampley v. Ruettgers*, 704 F.2d 491, 496 (10th Cir. 1983) (recognizing that in

maintaining control of inmates, a prison guard often is called upon to "make instantaneous, on-

the-spot decisions concerning the need to apply force without having to second-guess himself").

"Ordinarily, an excessive force claim involves two prongs: (1) an objective prong that

asks if the alleged wrongdoing was objectively harmful enough to establish a constitutional

violation, and (2) a subjective prong under which the plaintiff must show that the officials act[ed]

with a sufficiently culpable state of mind." *Smith v. Cochran*, 339 F.3d 1205, 1212 (10th Cir.

2003) (internal quotation marks and citation omitted). *Cf. Snyder v. Spilde*, 15-cv-02169-GPG, 2016 WL 1059612, at *2 (D. Colo. Mar. 17, 2016).

The objective prong of the excessive force analysis "is contextual and responsive to contemporary standards of decency." *Whitington v. Sokol*, No. 06-cv-01245-PAB-CBS, 2009 WL 2588762, at *8 (D. Colo. Aug. 18, 2009) (quoting *Hudson*, 503 U.S. at 6-7). The law recognizes that a prison guard's use of force against a prisoner does not always constitute a constitutional violation. *Sampley*, 704 F.2d at 494. Not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9 (citation omitted). The Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force, "provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9-10 (internal quotes and citation omitted). A plaintiff is not required to sustain either serious or significant injuries to satisfy the objective component of an Eighth Amendment excessive force claim. *See Hudson*, 503 U.S. at 9. *Cf. Northington v. Jackson*, 973 F.2d 1518, 1523 (10th Cir. 1992) (the constitutional inquiry is on whether the infliction of pain was unnecessary and wanton).

> This is not to say that the absence of serious injury is irrelevant to the Eighth Amendment inquiry. [T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary in a particular situation. The extent of injury may also provide some indication of the amount of force applied.

*Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (internal quotation marks and citations omitted).

The subjective element of the excessive force analysis asks whether the defendant had a sufficiently culpable mind. This element focuses "on whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." *Webb v. Sterling Correctional Officer Delaney*, No. 14-cv-1461-RBJ-CBS, 2016

WL 931218, at *3 (D. Colo. Mar. 11, 2016) (citing *Smith*, 339 F.3d at 1212).  "Whether pain is

wantonly and unnecessarily inflicted depends, at least in part, on whether force could have

plausibly been thought to be necessary to maintain order in the institution and to maintain the

safety of the prison personnel or inmates."  *Whitington*, 2009 WL 2588762, at *8 (quoting

*Hickey v. Reeder*, 12 F.3d 754, 758 (8th Cir. 1993)).

In deciding whether the use of force was necessary or instead was wanton, a court must

consider "the need for application of force, the relationship between that need and the amount of

force used, the threat reasonably perceived by the responsible officials, and any efforts made to

temper the severity of a forceful response."  *Jackson v. Austin*, 241 F. Supp. 2d 1313, 1318 (D.

Kan. 2003) (citation omitted).  The use of force is justified when there is a concern for the safety

of the institution, the guards, and the inmates.  *See Hickey*, 12 F.3d at 759; *see also Whitley*, 475

U.S. at 320 (prison officials may use reasonable force in good faith to "maintain or restore

discipline").

Here, even taken in the light most favorable to Plaintiff, as required, the allegations fail to

state a claim for relief as to the shattering of the plexiglas barrier.  Plaintiff alleges that behind

the plexiglas barrier, he was unchained.  AC at p. 6.  He further alleges that the barrier was

"otherwise unbreakable thick plexiglas."  *Id.* at p. 8.  Balsick was the officer responsible for re-

issuing personal property to Plaintiff and had to "open canvas bags ... and record items as he

handed it thru the hinged slot."  *Id.* at p. 7.  Plaintiff was "unfamiliar with Balsick – I kept

forgetting or mispronouncing his name – which aggravat[ed] him."  *Id.*  Plaintiff does not allege

any reason that he would need to repeatedly use the guard's name during this task.  Plaintiff

alleges that he replied to Balsick's aggravation, stating 'because you are violating BOP policy by

not wearing a nametag.'"  *Id.*  Balsick then "began to scream" at Plaintiff.  *Id.* When Defendant

MacGrath appeared, Plaintiff further "factually pointed out that" the guards were "not wearing BOP required nametags [and] both were out of uniform." *Id.*

The context that Plaintiff alleges is thus a guard in a maximum security facility attempting to complete a property review that required Plaintiff's attention to the task. Plaintiff instead focused his attention on the guards' apparel, Balsick's name, and MacGrath's smoking. AC at pp. 7-8. In this context, Balsick's striking and shattering the plexiglas barrier in front of Plaintiff does not meet the objective prong of this claim. The force was *de minimis* – it was not directed to Plaintiff's person, plausibly could be thought necessary to refocus Plaintiff on the task at hand, and is not of a sort repugnant to the conscience of mankind. *See, e.g., McMiller v. Wolf*, No. 94-cv-0623E(F), 1995 WL 529620, at *2–3 (W.D.N.Y. Aug. 28, 1995) ("Wolf is merely accused of snatching the plaintiff's mirror, breaking it against the cell bars and thereby lacerating the plaintiff's finger. … To consider the plaintiff's claim as a species of constitutional claim degrades the magnificent document under which the claim is asserted"). Plaintiff's allegations stand in stark contrast to cases in which the Tenth Circuit has found an officer's shattering of glass supported a plausible excessive force claim. *See, e.g., Davis v. Clifford*, 825 F.3d 1131, 1134 (10th Cir. 2016) (allegedly shattering car window, pulling unarmed misdemeanor arrestee through the broken window by her arms and hair, and pinning her face-down in the broken glass, which allegedly caused plaintiff to suffer an anxiety attack requiring a hospital trip, presented fact issues for excessive force claim).

Moreover, as *Wilkins* states, the extent of the alleged injury is also relevant to whether the force could plausibly be thought necessary and the amount of force used. Here, the only injury that Plaintiff alleges from the plexiglas shattering was that it "sen[t] small sharp pieces of that plexiglas into my eyes (even over the top of my eyeglasses) and nose and mouth." AC at p. 8.

13

He alleges that he was able to remove the shard from his eye; he does not allege a need for medical care, serious pain, or any lasting effects from the shards of plexiglas.  These facts are similar to the minor injuries caused by force that courts have found *de minimis.  See, e.g., Marshall,* 415 F. App'x at 853 (bruised arm from guard digging in his fingernails) and *Perrian v. Coons*, No. 13-cv-02951-KLM, 2015 WL 1539022, at *12 (D. Colo. Mar. 31, 2015) (cut on wrist without swelling).  Contrast *Hall v. Donhue*, No. 3:07-CV-146 RM, 2007 WL 2609853, at *2 (N.D. Ind. Sept. 5, 2007) (excessive force claim survived Rule 12 in part because the plaintiff alleged "this officer did punch the glass window out of anger causing me a serious eye injury, a cut on my nose and intense pain").  In short, Balsick's shattering of the plexiglas barrier in context is a *de minimis* use of force that does not support an excessive force claim.[6]

As for Balsick's allegedly slamming the slot door on Plaintiff's hand, Plaintiff plausibly states a claim.  Plaintiff alleges that Balsick's striking of the barrier caused the plexiglas to

> crumble/shred apart where attached to (bolted to) the metal tubular support column- sending small sharp pieces of that plexiglas into my eyes (even over the top of my eyeglasses) and nose & mouth. … I showed both [guards] blood from my right eye and they again laughed hysterically again.  Balsick stated "Let me see that [plexiglas shard from my eye]."  And when I handed one of those plexiglas sharp shards to Balsick thru the plexiglas wall partition slot – Balsick maliciously & intentionally slammed the heavy slot shut on my left hand! Breaking bones in the 4th & 5th fingers and two deep to the bone lacerations on 5th finger.

AC at p. 8.  Defendants allegedly saw the "severe injuries" to Plaintiff's fingers, laughed, and said among other things that they were "glad we f–d you up," hoped Plaintiff would lose the fingers, and "that's what happens when you f— with us."  *Id.* at p. 9.

---

[6] It is also questionable whether Plaintiff plausibly alleges that Balsick acted with a culpable state of mind in striking the plexiglas barrier.  *See, e.g., Pena v. Greffet*, 108 F. Supp. 3d at 1033 (allegations that were merely consistent with malice, not suggestive of it, did not suffice).  Plaintiff's allegations are equally consistent with a good faith attempt to refocus Plaintiff on the task.  Plaintiff was not written up for the incident, but his other allegations make implausible that he was fully complying.

On the one hand, Balsick's slamming of the slot door on Plaintiff's hand could be consistent with a "good faith effort to maintain or restore discipline," *Hudson*, 503 U.S. at 6. Plaintiff alleges the shard that he "handed" to Balsick was "sharp."  AC at p. 8.  Regardless that it was "small," any sharp object is a legitimate security concern in a prison.  *Cf., Hall,* 935 F.2d at 1113 (discussing legitimate safety interest in prison regulations prohibiting prisoners from possessing any sharp objects that could be used as weapons).  Plaintiff does not allege that Balsick instructed him to *hand* the shard to him, but only to let him see it, *i.e.,* put it through the slot.  From Plaintiff's allegations, immediately after "aggravating"[7] the guard to shatter the plexiglas such that it "shred apart" at the "metal tubular support," Plaintiff attempted to hand a sharp and apparently still bloody piece of it directly into the guard's hand.  On the other hand, assuming Plaintiff's allegations are true and giving reasonable inferences, Plaintiff alleges that he did so because Balsick ordered him to give him the shard.  The extent of Plaintiff's alleged hand injury (two fractured fingers and lacerations "to the bone" of his pinky finger that continued to bleed 2 hours later, AC at p. 10) also suggests more force was used than would be necessary if the guard's intent were simply to stop Plaintiff from continuing to move his hand through the slot, or to make him lose his grip on the shard.

Although "it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely," *Sanchez,* 810 F.3d at 756, Plaintiff's claim that Balsick slammed the slot door on Plaintiff's fingers only to wantonly inflict pain without a legitimate penological purpose is better addressed at a later stage.  *See, e.g., Escobar v. Zavaras*, No. 97-1303, 149 F.3d 1190 (Table), 1998 WL 314303, at *3 (10th Cir. June 2, 1998) (unpublished opinion) (fact issue precluded summary judgment on excessive force claim alleging

---

[7] *See, e.g.,* AC at p. 7, "aggravating;" Doc. #56 at p. 3 "merely being obnoxious" is "nearly identical to this claim."

that guard deliberately slammed slot door and broke prisoner's finger); *Whitington*, 2009 WL

2588762, at *10; *Banks v. Cty. of Westchester,* 168 F. Supp. 3d 682, 685-86, 689–91 (S.D.N.Y.

2016) (claim that prison guard allegedly smashed prisoner's hand against steel cell door,

fracturing finger and requiring surgery, survived Rule 12).[8]  "The allegations may be improbable,

but they are not implausible."  *Gee,* 627 F.3d at 1189.

> B.     *Deliberate Indifference to Serious Medical Needs: Delay in Treating Fractured and Lacerated Fingers*

Turning to the claim of deliberate indifference in delaying medical care for Plaintiff's

hand, "the treatment a prisoner receives in prison and the conditions under which he is confined

are subject to scrutiny under the Eighth Amendment."  *Farmer v. Brennan,* 511 U.S. 825, 832

(1994) (internal quotation marks omitted).  "The Eighth Amendment's prohibition of cruel and

unusual punishment imposes a duty on prison officials to provide humane conditions of

confinement, including adequate … medical care, and reasonable safety from bodily harm."

*Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (citation omitted).  The Eighth

Amendment also prohibits "unnecessary and wanton infliction of pain," including "deliberate

indifference to serious medical needs of prisoners."  *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).

Prison officials may be liable for an Eighth Amendment violation for "indifference . . .

manifested . . . in their response to the prisoner's needs or by . . . intentionally denying or

delaying access to medical care or intentionally interfering with treatment once prescribed."

*Estate of Booker v. Gomez*, 745 F.3d 405, 429 (10th Cir. 2014) (quoting *Estelle*).

"The test for constitutional liability of prison officials [for denying or delaying medical

care] involves both an objective and a subjective component."  *Mata v. Saiz,* 427 F.3d 745, 751

[8] Plaintiff cites *Brown v. Lippard,* 472 F.3d 384 (5th Cir. 2006) and *United States v. Budd,* 496 F.3d 517 (6th Cir. 2007).  Doc. #56 at 3.  Neither case is persuasive.  The factual contexts – a prisoner shackled hands and feet, seated in a chair and surrounded by three officers; and a hand-cuffed prisoner already kneeling –differ dramatically from Plaintiff's allegations.

(10th Cir. 2005) (internal quotations and citation omitted).  First, the prisoner must "produce objective evidence that the deprivation at issue was in fact 'sufficiently serious.'"  *Id.* (quoting *Farmer*, 511 U.S. at 834).  "[A] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Mata*, 427 F.3d at 751 (holding that even a physician's grossly negligent medical judgment is not subject to scrutiny if the prisoner's need for medical treatment was not obvious) (internal quotations and citation omitted).

Under the subjective component, the prisoner must establish deliberate indifference to his serious medical needs by "present[ing] evidence of the prison official's culpable state of mind."  *Mata*, 427 F.3d at 751.  "Deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain."  *Estelle*, 429 U.S. at 104 (internal quotation and citation omitted).  The Tenth Circuit recognizes two types of conduct constituting deliberate indifference.  The first occurs when a medical professional fails to properly treat a serious medical condition.  Under this type of deliberate indifference, an assertion of negligence or medical malpractice does not give rise to a constitutional violation.  *Perkins v. Kan. Dept. of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999).  *See also Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009) ("'an inadvertent failure to provide adequate medical care' does not rise to a constitutional violation," quoting *Estelle,* 429 U.S. at 105–06).  A prisoner's disagreement with medical personnel over the course of his treatment also does not state a claim.  *Perkins*, 165 F.3d at 811.

The second type of deliberate indifference occurs when a prison official prevents an inmate from receiving treatment or denies him access to medical personnel capable of providing treatment.  *See Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).  A prison official

who serves "'solely . . . as a gatekeeper for other medical personnel capable of treating the condition' may be held liable under the deliberate indifference standard if she 'delays or refuses to fulfill the gatekeeper role.'" *Mata*, 427 F.3d at 751 (quoting *Sealock*, 218 F.3d at 1211).

The subjective standard requires a state of mind "akin to recklessness in the criminal law, where, to act recklessly, a person must consciously disregard a substantial risk of serious harm." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 837) (internal quotations and citation omitted). Under this standard, "the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Self*, 439 F.3d at 1231 (internal quotations omitted). The plaintiff must allege that defendants personally participated in the Eighth Amendment violation. *See Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Self*, 439 F.3d at 1231 (internal quotations omitted).

Here, Plaintiff claims that Defendants Balsick, MacGrath, Melvin and Haygood delayed Plaintiff's access to medical care for his hand. Plaintiff alleges that Balsick and MacGrath, apparently when they were still in the divided room with Plaintiff after his hand was injured in the slot, "refused to summon ADX medical personnel and told [them] later do not treat him he'll sue us." AC at p. 9. Two hours later, Defendants Melvin and Haygood "refused to contact ADX medical staff to report []or treat" Plaintiff's "serious injuries." *Id.* at p. 10. Plaintiff does not allege that he sought or needed medical care for the shards in his face, but rather that Melvin

"could see the blood dripping down my hand onto the SHU floor all the way back to my cell – some 150-200 feet from [the] discovery room."  AC at p. 10.  He alleges that Defendant Osagie did not provide medical treatment for these injuries until 30 days later because "Balsick and MacGrath told me not to."  *Id.* at p. 9.  Plaintiff alleges the delay "resulted in serious permanent scars and injuries to my left hand."  *Id.*

A delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm."  *Oxendine v. Kaplan,* 241 F.3d 1272, 1276 (10th Cir. 2001) (quotations and citation omitted).  The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain."  *Garrett v. Stratman,* 254 F.3d 946, 950 (10th Cir. 2001) (citation omitted).  Plaintiff conclusorily states that he incurred serious permanent scars and injuries due to the 30 day delay in treatment for his broken and lacerated fingers, but he does not allege what serious injuries arose from the delay.  AC at p. 9.  Nor does he allege what treatment he received a month later, or what, if any, lasting effects he has suffered due to the delay in treatment.  "[I]t is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and not solely the symptoms presented at the time the prison employee has contact with the prisoner."  *Duran v. Donaldson*, No. 15-2160, – F. App'x –, 2016 WL 6087651, at *4 (10th Cir. Oct. 18, 2016) (internal quotation marks omitted; affirming dismissal because "decreased grip strength and discomfort" in finger allegedly due to lack of physical therapy was not a sufficiently serious injury).  Plaintiff does not plausibly allege facts that he has suffered lasting injuries to his left hand due to the delay.

As for suffering considerable pain, Plaintiff does not expressly allege that he experienced considerable pain from his untreated injury.  AC at p. 9.  He also does not allege that the fractures to his fingers were visible, such that the guards would know of the potential for pain

from fractures when they allegedly refused to summon medical personnel.  *See Barron v. Macy,* 2007 WL 2403316, at *1 (D. Kan. Aug. 17, 2007), *aff'd,* 268 F. App'x 800, 801 (10th Cir. Mar. 11, 2008) (noting the district court's observation that in alleging a broken pinky finger and several hours of throbbing pain, "Barron 'cited no swelling, discoloration, bleeding, or [visible] broken bones that would make his injury as one obviously needing immediate medical care.'").

However, Plaintiff does allege that (a) the slot door slamming also caused "two deep to the bone lacerations on [his] fifth finger," (b) MacGrath and Balsick saw those injuries in the discovery room, and allegedly commented that they "were glad we f—you up" and "hope you lose those two fingers," and (c) Melvin could see when he returned him to his cell "the blood dripping down my hand onto the SHU floor all the way back to my cell – some 150-200 feet from [the] discovery room."  *Id.* at pp. 8-9.  Plaintiff does not expressly allege that Defendant Haygood, who was with Lieutenant Melvin at that time, could also see the bleeding lacerations. Both Melvin and Haygood allegedly recognized in their conversation with Plaintiff that his hand was "beat up."  *Id.* at p. 10.  These comments suggest that each of the four Defendants recognized the hand injury could cause significant pain if left untreated.

Whether a delay in treatment for broken or lacerated fingers can support a claim for deliberate indifference to a serious medical need is a close call.  *See, e.g., Abu-Fakher v. Bode,* 175 F. App'x 179, 183 (10th Cir. 2006) (allegations that prison gave pain reliever and ice the same day as Plaintiff's finger injury, but took more than ten days to discover the finger was fractured and then gave him no pain reliever or splint, failed to state deliberate indifference claim); *Davis v. Caruso*, No. 07-10115, 2008 WL 540818, at *7 (E.D. Mich. Feb. 25, 2008) (48-hour delay in receiving pain reliever and ice, three week delay in x-raying due to equipment failure, did not allege deliberate indifference to broken finger); *Ruiz v. Homerighouse,* No. 01-

cv-0266E(SR), 2003 WL 21382896, at *3 (W.D.N.Y. Feb. 13, 2003) (one week delay before

seeing specialist for fractured metacarpal was insufficient to state a claim because, *e.g.*, a

"broken finger, without more, simply does not present a condition of urgency of the type that

may produce death, degeneration or extreme pain which correspondingly merits constitutional

protection," internal quotation marks omitted, collecting cases). *See, e.g., Edwards v. Snyder*,

478 F.3d 827, 828 (7th Cir. 2007) (prisoner who "suffered an open dislocation[,] a bone in his

right-hand middle finger was pushed severely backwards and punctured the skin" and received

antibiotics and pain medication the same day, stated a deliberate indifference claim for two-day

delay in resetting the bone surgically).  Unlike *Abu-Fakher* and *Davis*, Plaintiff alleges that he

received no treatment whatsoever for 30 days.  He further alleges that Balsick, MacGrath,

Melvin and Haygood refused to give access to medical treatment because Plaintiff had

antagonized Balsick and MacGrath, because he files grievances and lawsuits against staff, or

because he would sue them for the injury if he received treatment.  Plaintiff's allegations

reasonably infer Balsick, MacGrath, Melvin and Haygood were deliberately indifferent to a

serious medical need.

C.      *Labeling as a "Snitch"*

In Claim One, Plaintiff also includes a sentence alleging that Balsick and MacGrath "later

that day [March 9, 2015] and for weeks to follow loudly labeling Plaintiff a 'snitch' in front of

other prisoners when I began to exhaust BOP administrative remedies on this."  AC at p. 9.  As

the court stated in *Armijo*, in *Benefield v. McDowall*, 241 F.3d 1267 (10th Cir. 2001), the Tenth

Circuit held that an inmate's allegations that he had been labeled a "snitch" was, by itself,

sufficient to meet the standard for a violation of the Eighth Amendment because it demonstrated

that the inmate was "incarcerated under conditions posing a substantial risk of serious harm."  *Id*.

at 1271; *see also Brown v. Narvais*, 265 F. App'x 734, 736 (10th Cir. 2008) ("allegations of a

21

prison officer's deliberate disclosure of dangerous information about an inmate's status are sufficient to state a claim under the Eighth Amendment provided the alleged danger is facially concrete and plausible enough to satisfy basic pleading standards."); *Northington v. Marin*, 102 F.3d 1564 (10th Cir. 1996) (labeling an inmate a "snitch" constitutes deliberate indifference to the safety of that inmate). Here, Plaintiff alleges the specific defendants who allegedly labeled him as a snitch, the dates, and infers that other prisoners heard them say this. However, Plaintiff does not allege that he was harmed in any way by this conduct. This fails to allege a "danger [that] is facially concrete and plausible" to give Plaintiff standing to bring the claim. The court recommends dismissing this part of Claim One without prejudice.

IV.     *Claim Two: Secondhand Chemical Gas Incident.*

Plaintiff alleges that on February 26, 2015, he spoke to Defendant Martin and each of ten unknown BOP employees while they were preparing to gas a neighboring cell and informed them that he was asthmatic. Martin allegedly acknowledged that BOP policy[9] required removing asthmatics from the area before gassing the neighboring cell. Each of these eleven Defendants allegedly told Plaintiff that they were refusing to remove him from the area because he filed grievances and lawsuits against staff. AC at pp. 11-12. Plaintiff further alleges that they each "knew I was life-long asthmatic and that I would be harmed and injured by their … refusing to easily remove me from the gas discharge area before deploying these chemical weapons in unnecessarily copious amounts to bleed into my cell from shared vent and otherwise." *Id.*

---

[9] Defendants argue there is no such policy and that the allegation is conclusory. *See, e.g.,* AC at p.11 (referring to a "BOP policy" without identifying it or why Plaintiff believes the policy exists); Doc. #56 (Response) at p. 13 (same). The court has reviewed the cases that Plaintiff cites (*Id.*) for support that an agency must follow its policy; none regard whether prisoners must allege the source or citation of a prison policy. Because Plaintiff's claim will go forward regardless, the court does not resolve this issue.

A.      *Failing to Remove Plaintiff Before Using Chemical Gas in Neighboring Cell, and Deliberately Excessive Gas to Increase Plaintiff's Secondhand Exposure*

In these allegations, Plaintiff does not specify whether he believes the failure to remove him before gassing a neighboring cell was excessive force or deliberate indifference to a serious risk of harm in the conditions of confinement.  Plaintiff cites cases regarding both theories.  Doc. #56 at p. 11 (citing respectively, *Smith v. United States*, 561 F.3d 1090 (10th Cir. 2009) and *Torres-Viera v. Laboy-Alvarado*, 311 F.3d 105 (1st Cir. 2002)).  Because Plaintiff alleges a prison security measure taken in response to a disturbance or an attempt to maintain order, this is not a claim governed by the deliberate indifference standard.

> Where … officials act in response to a prison disturbance, their actions are necessarily taken in haste, under pressure, and balanced against competing institutional concerns for the safety of prison staff or other inmates.  In such an emergency situation ... wantonness consist[s] of acting maliciously and sadistically for the very purpose of causing harm.

*Miller,* 948 F.2d at 1566–67 (internal quotation marks omitted, quoting *Wilson v. Seiter,* 501 U.S. 294, 302 (1991); *Whitley,* 475 U.S. at 320-21).  *See also Torres-Viera*, 311 F.3d at 107 (malicious and sadistic conduct required to state a claim regarding the behavior of prison officials during riots or other disturbances).  "This standard is appropriate 'regardless of whether the corrections officers are quelling a prison disturbance or merely trying to maintain order.'" *Gargan v. Gabriel,* 50 F. App'x 920, 923 (10th Cir. 2002) (quoting *Mitchell v. Maynard,* 80 F.3d 1433, 1440 (10th Cir. 1996)).  As for the objective prong for an excessive force claim, like the Tenth Circuit, the court "assum[es] that the use of mace and pepper spray could constitute excessive force." *Fogarty v. Gallegos*, 523 F.3d 1147, 1161-62 (10th Cir. 2008).

Regarding the subjective prong, Plaintiff's allegations are more detailed than the allegations that failed in *Armijo*.  In that case, Plaintiff alleged that on May 20, 2014, BOP employees needlessly exposed him to chemical gas and pepper spray in extracting another

inmate from a neighboring cell in SHU. *Armijo,* Civ. 15-448, Doc. #72 at p. 15. In that case, however, Plaintiff also alleged facts that made plain he was speculating that the incident was not an emergency: he admitted that he did not know why the guards gassed the neighbor, but only believed that the "inmate threw some small food item on an ADX/Alcatraz Prison Guard," and admitted that he had been asleep when the gassing began. *Id.* at p. 16. The claim failed for lack of fact allegations to support the officers had acted maliciously in not removing him. *Id.*

In this case, Plaintiff alleges that two hours passed between the initial planning of the gassing and the actual gas discharge. AC at p. 14. During those two hours, Plaintiff alleges he had a detailed conversation with Lieutenant Martin regarding the incipient gassing:

> On 02/26/15 it became obvious that the ADX Swat Team intended to deploy chemical weapons on the prison[er] in cell next door – in a non-emergency situation (that prisoner had thrown some food on one of the prison guards). At 12:15 p.m. I personally spoke with BOP/ADX Prison Guard Lieutenant Martin to whom I repeatedly stated: … you know … I am asthmatic. You know my cell and that cell share ventilation ducts. You know that BOP Policy requires to move asthmatics from area before deploying gas in non-emergency situations.
> Def. Martin responded: "I know you are asthmatic. Yes I see asthma inhalers. Some O.C. gas will get into your cell. Yes I know policy 'requires' me to remove [asthmatics] from area before deploying O.C. But all that is just tough s–, Custard. You should have thought about that before always filing grievances and lawsuits on us staff.

AC at p. 11. Plaintiff alleges that he had a similar conversation with "unknown named BOP agents 9 and 10." He alleges that Agent 9 said "we have to do what the lieutenant says," that "we all hate you because you sue staff, so I hope you choke to death." *Id.* at p. 12. Plaintiff further alleges that Agent 10 said "You heard the lieutenant, you should have thought about that before you filed all those grievances and lawsuits Custard, now its [sic] our turn to retaliate."

Plaintiff recognizes that this allegation may sound "surprising," but reiterates that these are the Defendant's actual words. *Id.*[10]

> As the ADX swat team began showing up in black gas masks and no nametags and in helmets to gas and extract … [the neighboring inmate], I made it a point to respectfully verbally engage each one (unknown named BOP agents 1-8) explaining [the same facts] as I had with … [the others] and each one – to a man and to a woman made the nearly identical statements as Martin.

*Id.* Plaintiff alleges that shortly after the gassing began in the neighboring cell, the chemical gas entered his cell and caused him to "vomit blood and severely choke and pass out banging my injured shoulder and my head causing concussion and to cough up flesh and blood from my lungs for 2-days thereafter," and apparently in passing out, "also bit a hole in my tongue" or "tearing teeth thru Plaintiff's lower lip."  AC at pp. 11, 13, 14.

On a Rule 12(b)(6) motion, the court must accept these fact allegations as true, despite appearing improbable of proof.  Doing so, Plaintiff has alleged Martin's and Does 1-10 personal participation, knowledge before the gassing that Plaintiff had asthma, knowledge of an (unspecified) BOP policy that they should remove asthmatics first unless it was an emergency, and no assertion that this was an emergency or they otherwise lacked the time to remove him. Martin stated to the effect that he was leaving him in his cell to punish him for filing grievances and lawsuits, or with the specific intent of causing him pain.  Plaintiff sufficiently alleges that Martin wantonly inflicted pain in failing to remove him before gassing his neighbor.

However, Plaintiff alleges that Does 9 and 10 told Plaintiff that they had to follow Lieutenant Martin's order to not remove him.  Plaintiff does not allege that any of the Does

---

[10] Plaintiff also recognizes that some of his allegations for Claim 3 sound unbelievable. *Id.* at p. 27 ("Am sure this all sounds 'unbelievable … but such is common here at ADX.").  This is an appropriate juncture for Plaintiff to take note of Federal Rule of Civil Procedure 11(b) and (c). Rule 11 requires among other things that "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."

actually had authority to countermand the lieutenant's order.  The allegations thus make

implausible that any of the Does 1-10 had authority to remove Plaintiff from his cell.  Without

authority to remove him from his cell, this part of the claim does not satisfy the subjective

element as to the Does.  Yet construing the Amended Complaint liberally as the court must for

*pro se* plaintiffs, Plaintiff also appears to allege that the Doe Defendants who discharged the gas

intentionally used excessive amounts of gas in order to increase Plaintiff's secondhand exposure.

Plaintiff does not allege how many of the ten Doe Defendants actually discharged the chemical

gas; assuming that Plaintiff files a motion to amend the AC to identify the Does, he shall also

specifically identify which of these individuals discharged the chemical gas.  To this extent only,

the Does remain as defendants on this claim.

> **B.**    *Deliberate Indifference to Serious Medical Need: Symptoms from Chemical Gas Inhalation*

Plaintiff alleges that after he awoke and activated the in-cell medical emergency alarm,

"all Defendants" refused his request to notify the medical department of his need for treatment.

AC at p. 13.  This is too conclusory to suffice as to any Defendants.  *See, e.g., Nasious v. Two*

*Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007) (a complaint must explain what

each defendant did to the plaintiff, when and how that defendant's actions harmed the plaintiff).

However, Plaintiff further alleges as to Defendant Osagie that:

> At any rate, I personally saw and spoke with Defendant Osagie (prison doctor assistant at ADX) requesting medical treatment and that a[n] injury assessment form be filled out and reported; Defendant Osagie refused, stating:

>> "We don't care if you bit a hole thru your tongue and if you are coughing up blood and a concussion… that's what you get for filing grievances and lawsuits against us.  Lt. Martin and all the others do not want you to have medical treatment so I will deny it to you."

> * * * When I asked Osagie to see [the] prison doctor Def. Santini[,] Osagie stated "Santini knows 'all about' this and says you 'deserve' it.  Santini told me not to

> provide any medical treatment and not to do an injury assessment report because
> you sue us staff."

AC at p. 13.[11]  Plaintiff further alleges that he never received treatment for his symptoms from inhaling the gas.  *Id.*  Plaintiff alleges this conduct "resulted in Plaintiff coughing up lung flesh and blood clots for 2-days, concussion and tearing teeth thru Plaintiff's lower lip."  *Id.* at p. 14. Although Plaintiff does not allege lasting injuries from the gas, the court infers from these allegations that Plaintiff endured substantial pain for two days.  Plaintiff sufficiently alleges that Defendant Osagie was aware of and deliberately indifferent to a serious medical need.

However, Plaintiff does not sufficiently allege Doctor Santini's personal participation in a constitutional violation.  Under § 1983, a supervisor can be liable based on "personal direction or actual knowledge and acquiescence [that] demonstrates deliberate indifference."  *Dodds v. Richardson*, 614 F.3d 1185, 1196 (10th Cir. 2010) (citing *Woodward v. City of Worland,* 977 F.2d 1392, 1399-1400 (10th Cir. 1992), *cert. den'd*, 509 U.S. 923 (1993)).  The court must assume as true for now Plaintiff's allegation that Osagie told Plaintiff that Santini knew of Plaintiff's secondhand gas inhalation.  Even assuming that the court must take as true a second-hand hearsay statement, if Dr. Santini knew that Plaintiff was exposed to secondhand gassing, this would not support that Santini knew the symptoms that Plaintiff was experiencing from it. Moreover, even assuming that Santini knew Plaintiff was asthmatic, knowledge of that medical condition would not necessarily suffice to show deliberate indifference to a serious medical need. *See, e.g., Reeves v. Sweet*, No. 1:04-cv-605, 2005 WL 2417659, at *4 (W.D. Mich. Sept. 30, 2005) (awareness that prisoner had asthma and heart condition was insufficient to allege awareness of substantial risk from second-hand exposure to chemical sprays); *cf., Davis v. Thomas,* 558 F. App'x 150, 154–55 (3d Cir.), *cert. denied*, 135 S. Ct. 269 (2014) (defendants

---

[11] Defendant points out that Plaintiff does not specify a date for this conversation with Osagie, but Plaintiff pled enough facts about this conversation to satisfy Rule 8.

showed that prisoner's asthma did not require him to never be exposed to second hand pepper spray); *Gargan,* 50 F. App'x at 924 (claim that alleged refusal to treat prisoner with a known heart condition for secondhand pepper spray, without explanation of why defendants should know the spray would exacerbate that condition, failed to state a claim).

Plaintiff also does not allege that Dr. Santini refused Plaintiff's request to see him instead of Osagie. Rather, Osagie denied that request. AC at p. 13. Even if Plaintiff alleged that Dr. Santini knew that Plaintiff had requested to see him instead of his staff, ignoring or denying such a request is not enough to personally involve Santini in deliberate indifference. *See, e.g., Brooks v. Colo. Dep't of Corr.,* No. 13-cv-02894-CBS, 2014 WL 5315000, at *9 (D. Colo. Oct. 17, 2014) (collecting cases, denying or ignoring a prisoner's letter of complaints was not enough to personally involve the defendant), *recon. denied*, No. 13-cv-02894-CBS, 2015 WL 3619221 (D. Colo. June 10, 2015), *appeal pending*.

As for Plaintiff's allegation that Santini allegedly instructed Osagie to not provide treatment to Plaintiff because he sues staff, Plaintiff's other allegations make this implausible. Plaintiff alleges that the day after the gas inhalation, a prison nurse provided treatment to Plaintiff for other conditions. AC at pp. 11, 23 (gassing occurred on 2/26/2015); p. 24 (on 2/27/2015, Plaintiff gashed his shin on the shower welds); p. 26 (6 hours after the gash, Plaintiff was taken to a prison nurse who placed temporary stitches). Twelve days later, Osagie also provided treatment for the gash. *Id.* In addition, in "the same general time frame" that Plaintiff alleges for this case (February through July 2015, AC at p. 15), Osagie treated Plaintiff's left hand in early April 2015. AC at p. 9 (30 days after the March 9, 2015 injury). These fact allegations make implausible that Santini instructed Osagie to not provide treatment to Plaintiff. Plaintiff has not alleged personal participation by Dr. Santini.

V.       *Claim Three: Cell A208 Shower*

Plaintiff alleges that he was assigned to the SHU from February 24, 2015 through July 2, 2015.  AC at p. 15.  He appears to allege that he was assigned to cell A208 for the first three weeks of that time period.  *Id.* at p. 21 (Defendant Melvin said "I will not move you to a better cell … not for 21-days."), p. 22 (alleging Plaintiff spoke to Defendant Belter twice during the 21 days he was in cell A208).  He further alleges that in cell A208 the jagged, sharp metal welds from the shower – combined with a lack of shower curtain to prevent water from reaching the cell's enamel-painted floor – were an obvious, substantial safety risk.  *Id.* at p. 15, *et seq.*  Plaintiff alleges other items in cell A208 likewise had sharp metal welds.  As the court summarized recently, Plaintiff alleges that:

> he informed Defendants MacGrath and Melvin about the dangerous condition of the shower, and reminded them that he had been injured in the same shower during a previous stay in the SHU. Defendant MacGrath told Plaintiff that he knew that inmates get hurt on the sharp metal welds, but they put him in that cell "on purpose" because of his grievance filings, and they were not going to move him to a different cell. Defendant Melvin stated that Plaintiff was put in that cell because he sues prison guards and that "nobody cared" if he fell and hurt himself on the slick shower floor. (*Id.* at 20). Mr. Custard further alleges that … according to Defendant Osagie, Defendants Melvin and Martin were responsible for his placement in cell 208. When Plaintiff complained about the cell conditions to Defendant Hess, an ADX captain, Hess responded that other cells were available, but the Lieutenants had ordered that Plaintiff be placed in cell 208 because of his grievance filings.  According to Mr. Custard, Defendant Hess also told him that he "r[a]n the SHU" (*id.* at 25), and that as soon as Plaintiff stopped filing grievances against staff, he would be placed in a "good" cell.
> * * *
> Plaintiff slipped in the shower on February 27, 2015, and injured himself on the protruding metal pieces, requiring 15 stitches to his left shin.

Doc. #19 at pp. 5-6.

A.       *Conditions of Confinement*

To make out a conditions-of-confinement claim, as with the other types of Eighth Amendment claims, Plaintiff must allege objective and subjective components.  For the objective

prong, the deprivation of a basic human need is sufficiently serious. *Wilson,* 501 U.S. at 298. The deprivation must be extreme. *Hudson*, 503 U.S. at 9. "Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id*. (internal citations and quotation marks omitted). The subjective component asks whether the prison official acted with "deliberate indifference" to inhumane conditions of confinement. *Wilson*, 501 U.S. at 303-04. This requires the same showing as discussed above with respect to excessive force and serious medical needs: that the defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "[T]he official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

Plaintiff's allegations regarding the shower barbs and the cell floor becoming slippery due to the uncurtained shower opening are similar to his allegations in the *Armijo* case. Civ. 15-448, Doc. #72 at 12. So too is his alleged injury in this case –15 stitches to his left shin, as compared to 15 stitches to his right knee in *Armijo*. *Id*. As the court stated recently in *Armijo*, when viewed in isolation, the allegations regarding the steel barbs might not be sufficient to state an arguable Eighth Amendment claim. However, when viewed in combination with the other allegations of this claim (denial of shower shoes, mat, and curtain to prevent injury on a slippery cell floor), *Wilson*, 501 U.S. at 304, they tend to show that Plaintiff was subjected to a sufficiently serious living condition, which caused a substantial risk of harm to his health or safety. *See Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980) ("[A] state must provide an inmate with shelter which does not cause his degeneration or threaten his mental and physical

well being"). Nevertheless, Plaintiff's allegations must still establish personal participation and a sufficiently culpable mental state on the part of each Defendant.

Plaintiff plausibly alleges the subjective element and personal participation by several Defendants on this claim, as follows.[12]  In refusing to reassign Plaintiff to another cell before the 21 day cell rotation, Captain Hess and Lieutenant Melvin were personally involved.  Captain Hess allegedly "told everybody not to move [Plaintiff] out of that cell and even [illegible] cell rotations to keep putting you back into that cell.  Asked who is everybody, Hess stated, 'All the Lieutenants that's who,'" *Id.* at p. 25, and Lieutenant Melvin refused to reassign Plaintiff.  *Id.* at p. 21.  Defendants argue that Plaintiff does not allege the requisite subjective element for Melvin because Plaintiff does not allege that Melvin agreed the cell was dangerous.  Plaintiff alleges that he showed the welds and lack of curtain to Melvin (*Id.* at p. 19), and Melvin said "Lots of inmates get cut on those welds. … Nobody cares if you fall on a slick floor. … I put you (assigned) in that cell because you sue us." *Id.* at p. 20.  This is enough to infer that Lieutenant Melvin knew the cell was dangerous and consciously disregarded the risk in order to punish Plaintiff for suing staff.

Defendants also argue that Hess's alleged statements do not infer that he knew the dangerous condition in cell A208 before Plaintiff's fall.  Hess allegedly said "I run SHU … The sooner you stop filing grievances on us the sooner I will get you out of that f-d up cell into a good cell… Of course we have other cells available but you were ordered put in that cell for a reason, for suing [ADX] staff." *Id.* at p. 25.  The reasonable inference from this allegation is that

---

[12] Compared to his claim in *Armijo*, the Amended Complaint in this case has more extensive allegations regarding the subjective element for each of the several Defendants remaining on this claim.  As noted above, Plaintiff alleges that he expressed his concerns regarding the dangerous shower condition  – the combination of the sharp welds, lack of shower curtain (and shoes and mat), and a cell floor that is slippery when wet – in conversations with each of the Defendants on this claim.  AC at pp. 18-25.

Captain Hess intentionally put and kept Plaintiff in cell A208 for the 21 days knowing that it was dangerous, as punishment for suing ADX staff.  These allegations plausibly allege the subjective element for the claim against Hess.

As to Lieutenant Martin,[13] Plaintiff plausibly alleges personal participation in refusing to reassign him from cell A208, but does not plausibly allege that Martin knew the dangerous condition in that cell and consciously disregarded it in that refusal.  AC at p. 23.  Plaintiff alleges that he spoke to Martin about this request at the same time that he requested to be removed before the staff used chemical gas in the neighboring cell.  AC at pp. 11, 23 (alleging conversation at 12:15 p.m., February 26, 2015).  Although he alleges that he "raised the entire facts and circumstances giving rise to this claim" with Martin, and had nearly identical conversations with all of the Defendants on this claim, these assertions are too conclusory to plausibly allege that Martin knew cell A208 was dangerous and refused to reassign Plaintiff in conscious disregard of that danger.

The only guard whom Plaintiff alleges as refusing to reassign him, Defendant MacGrath, said "*We* could move you to another cell but *we* won't," not that MacGrath himself refused to move Plaintiff.  *Id.* at p. 20 (emphasis added).  Plaintiff's allegation of Captain Hess's order to not reassign Plaintiff's cell makes implausible that MacGrath had any authority to do so.

In addition, Plaintiff alleges that Defendants Behle, Espinoza, MacGrath and Martin allegedly refused to give Plaintiff a shower curtain (or in some cases, shower shoes or a shower mat) "for over two weeks" because he sues staff.  AC at pp. 15, 20, 23, 24.[14]  Plaintiff does not allege that he asked Lieutenant Martin for shower shoes or a shower mat, and Martin allegedly

---

[13] In their motion, Defendants omit Lieutenant Martin from this claim.  Martin remains a named defendant on Claim 3.  AC at pp. 23, 24, 26; Doc. #19 at p. 5.

[14] For Defendant Lieutenant Melvin, Plaintiff does not allege personal participation in withholding a shower curtain.  He also does not allege that Captain Hess or the maintenance supervisor (McMullen) or worker (Belter) were involved in withholding a shower curtain.

told Plaintiff to "get a shower curtain from Brant." *Id.* at p. 20. [15]  Martin did not personally

participate in this alleged constitutional violation.  Defendants argue that Plaintiff does not allege

he showed Behle and Espinoza the sharp welds or the other conditions in the cell, so they were

not aware of the danger from his lack of shower items.  However, Plaintiff alleges that "every

defendant named in [this] claim[,] I had the near exact conversations with personally … to which

each responded and acted or refused to act" in the same way, namely, recognizing the danger but

refusing Plaintiff's requests.  AC at p. 20.  Plaintiff adequately alleges this claim against Behle

and Espinoza.

In addition to the prison guards, Plaintiff also sues the maintenance supervisor

(McMullen) and maintenance worker (Belter) on this claim.  As the court recently summarized,

Plaintiff alleges that

> he informed Defendant Belter, an ADX maintenance worker about the dangerous
> condition of the shower, but Belter told him that he would not weld down the
> metal protrusions because of Plaintiff's grievance filings. Defendant McMullen,
> the ADX maintenance supervisor, also refused to weld down the metal
> protrusions, stating that he did not care if any inmates were injured as a result of
> the metal pieces.

Doc. #19 at pp. 5-6.  See AC at pp. 22, 25.  Defendants argue that because Belter spoke to

Plaintiff through a solid door, it is unclear whether he was aware of the true condition of the

sharp welds.  This is a fact issue to resolve at a later phase.  At this point, the court must give

Plaintiff the reasonable inferences regarding Belter's knowledge and intentional state of mind

from his statements that suggest he did know the dangerous condition of the sharp welds and

intentionally exposed Plaintiff to the risk of harm.  AC at p. 22.  Defendants similarly argue that

McMullen's state of mind is unclear because Plaintiff does not allege when he spoke to

---

[15] Plaintiff also alleges that he asked Defendant Martin for shower shoes, which Martin refused
to provide.  *Id.* at p. 24.  Plaintiff does not allege that he requested a shower mat from anyone,
but only that they did not provide such.  *Id.* at p. 24.

McMullen – before or after his shin injury.  Giving reasonable inferences to McMullen's alleged statement that "no matter what ADX inmate gets hurt or how many times an ADX inmate gets hurt … no one cares about ADX inmates," this plausibly alleges the subjective element as to McMullen.  Defendants further argue that Plaintiff does not allege either Belter or McMullen had the authority to fix the welds.  However, Plaintiff alleges that Belter "is largely responsible for maintaining ADX quarters," and McMullen is the "maintenance foreman."  AC at pp. 22, 25. Plaintiff plausibly alleges that Belter and McMullen had authority to fix the sharp welds.

In short, the conditions of confinement portion of Claim Three will go forward against Defendants Behle, Belter, Espinoza, Hess, MacGrath, Martin, McMullen, and Melvin but only as to the respective factual bases that apply to each of these Defendants as noted above.

> **B.** *Deliberate Indifference to Serious Medical Need: Shin Injury*

For this part of Claim 3,

> [Plaintiff] alleges that Defendant Osagie refused to respond to his alarm for a medical emergency, and that a correctional officer enabled him to receive butterfly stiches approximately six hours after the injury. However, the butterfly sti[t]ches did not hold and Mr. Custard continued to bleed for 12 more days, and experienced significant pain, before Defendant Osagie stitched the deep 4"-long wound with real stitches.

Doc. #19 at p. 6.[16]  Specifically, Plaintiff alleges that on March 1, 2017, Osagie refused to put in real stitches and continued to refuse to do so for 12 days.  AC at pp. 26.  Plaintiff does not directly allege why Osagie refused to further treat the shin wound for 12 days.  However, Plaintiff alleges that Osagie falsely stated in his medical records that Plaintiff had been seen "put[ting] toothpaste in that open wound."  AC at p. 26.  This allegation infers that Osagie falsely recorded Plaintiff's toothpaste-in-wound to justify refusing to replace the butterfly stitches.

The deep, lengthy, and continuously bleeding wound that Plaintiff alleges he endured

---

[16] Confusingly, Plaintiff also alleges that after the butterfly stitches, he received the "real stitches next day [by] Osagie."  AC at p. 24.

from March 1 until Osagie placed real stitches was a serious laceration that would be obvious to

laypersons.  *See, e.g., Self,* 439 F.3d at 1232.  Although a close call, the unnecessary, significant

pain that Plaintiff alleges he suffered for 12 days due to the lack of permanent stitches suffices as

a serious medical need.  The alleged false medical record plausibly suggests deliberate

indifference to that pain.  This part of Claim 3 will go forward against Osagie.

However, the remainder of Plaintiff's alleged factual bases for delay or denial in medical

care fail to state a claim.  Plaintiff alleges cursorily that Osagie "refused to give me the needed

asthma inhalers" on February 25, 2015.  AC at p. 21.  This allegation is too conclusory; there is

no allegation of harm or substantial pain.  Plaintiff also apparently had the inhalers by the next

day.  *Id.* at p. 23.  Plaintiff further alleges that on the morning of February 26, 2015 (the same

day as, but before, Plaintiff's secondhand chemical gas exposure), Osagie refused to give

Plaintiff bandaids for his bleeding hand.  *Id.*  This likewise is too conclusory – the date precedes

the hand injury in Claim 1, and there is no allegation of harm or substantial pain.  Plaintiff also

claims that he should have been permitted to see Dr. Santini instead of Osagie for the removal of

his stitches.  AC at p. 27.  As the court noted in *Armijo*, a prisoner's disagreement with medical

personnel over the course of his treatment does not make out a cause of action.  *Perkins*, 165

F.3d at 811.

VI.     *First Amendment Retaliation Claims*

For his First Amendment claim, Plaintiff must allege

facts to show that (1) he was engaged in constitutionally protected activity, (2) the
Defendant's action caused him to suffer an injury that would chill a person of
ordinary firmness from continuing to engage in that activity, and, (3) the
Defendants' adverse actions was substantially motivated as a response to
Plaintiff's constitutionally protected activity.

Doc. #19 at pp. 14-15 (citing *Nielander v. Bd. of Cnty. Comm'rs,* 582 F.3d 1155, 1165 (10th Cir.

2009); *Gee,* 627 F.3d at 1191; and *Frazier v. Dubois*, 922 F.2d 560, 562 n.1 (10th Cir. 1990)).

The First Amendment claims regard the individual Defendants in their official capacities, BOP only "to the extent he asserts arguable retaliation claims" against the individuals, and only declaratory and injunctive relief.  Doc. #19 at p. 14.

Defendants argue that Plaintiff fails to state any retaliation claims because he has not been chilled from filing grievances and lawsuits, *i.e.,* from his constitutionally protected activity of petitioning the government for redress under the First Amendment.  Plaintiff responds that his claims "are not access to court claims but … for Plaintiff's lawful exercise of freedom of speech."  Doc. #56 at pp. 6, 17.  He argues that the alleged Eighth Amendment violations are retaliation for exercising his first amendment right to "criticize … any … government agent." *Id*. at p. 6.  *See also Id.* at p. 8 (Plaintiff arguing that his retaliation claims allege Defendants "attempt[ed] to chill my free speech to … criticize Defendants' unlawful conduct and behavior"). Plaintiff relies on *Jamal v. Kane,* 105 F. Supp. 3d 448 (M.D. Penn. 2015) for the proposition that

> [a] past criminal offense does not extinguish the offender's constitutional right to free expression.  The First Amendment does not evanesce at the prison gate, and its enduring guarantee of freedom of speech subsumes the right to expressive conduct that some may find offensive.

*Jamal,* 105 F. Supp. 3d at 452.[17]

However, the only "criticism" to which Plaintiff refers in his response are his "prison grievances[,] … civil actions and … verbal[]."  Doc. #56 at p. 9.  Plaintiff alleged verbal criticism of ADX staff only in the plexiglas incident, and that retaliation claim was dismissed already for lack of the third element, causation.[18]  Rather, Plaintiff uniformly alleges that the

---

[17] *Jamal* regards a statute restricting speech that would in effect revictimize the victims of crime, 105 F. Supp. 3d at 458-59; it does not regard prisoners' speech to prison staff.

[18] The retaliation portion of Claim 1 was already dismissed for failure to allege Defendants "engaged in the alleged verbal and physical abuse because" of Plaintiff's filing lawsuits or grievances.  Doc. #19 at p. 15.  Plaintiff does not show any grounds for the court to reconsider that dismissal.  Plaintiff has not cited any Tenth Circuit authority that would protect a prisoner's criticism of guards.  *See, e.g., Owen v. Medina,* Civ. 12-94-RM-CBS, 2013 WL 10445705, at *3

Defendants told him that they were acting or refusing to act in retaliation for the fact that he grieves and sues staff (*i.e.,* exercises the right to petition), not because of specific content or speech therein.  Accordingly, Plaintiff's cited cases regarding free speech rights are not on point.

Plaintiff does not dispute that he has not been chilled from exercising his right of petition. In the Amended Complaint, Plaintiff acknowledges that he has been a frequent filer of grievances and § 1983 lawsuits against prison staff.  AC at pp. 28-29.  In his response, Plaintiff recognizes that he has several pending cases and does not dispute that subsequent to the alleged 2015 retaliation, he continues to file several grievances and lawsuits.  *See, e.g.,* Civ. 16-818-LTB; 16-885-LTB, 16-2730-GPG (D. Colo.).  Defendants argue this is an admission that Plaintiff has suffered no injury to satisfy the second element for retaliation claims, and has not alleged a likely future harm as required to state claims for injunctive relief more generally.[19] Defendants rely *inter alia* on the court's dismissal of similar retaliation claims in *Armijo.*

In *Armijo*, the court noted that although "a plaintiff who has been constitutionally injured can bring a [*Bivens*] action to recover damages, that same plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate a chance of being likewise injured in the future."  *Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991).  "Abstract injury is not enough. The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be

---

(D. Colo. Dec. 31, 2013), *rec. adopted*, 2015 WL 1524766 (D. Colo. Mar. 31, 2015).  "[A] prison inmate retains [only] those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell v. Procunier,* 417 U.S. 817, 822 (1974) (cited with approval in *Johnson v. California,* 543 U.S. 499, 510 (2005)).

[19] Defendants frame this issue as a lack of standing and subject matter jurisdiction.  Doc. #44 at p. 4.  It appears that they challenge Plaintiff's standing facially on the allegations; thus the court analyzes this issue under the same legal standard as Rule 12(b)(6).  *See, e.g., Holt v. United States,* 46 F.3d 1000, 1002 (10th Cir. 1995).

both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-102 (1983).

However, Plaintiff's allegations in this case differ from *Armijo* in material ways for his retaliation claims.  As to the Claim 2 allegedly retaliatory failure to remove him before gassing a neighboring cell, this is now the second instance of secondhand gas exposure that Plaintiff has brought to the court.  He further alleges that the Doe Defendants who discharged the gas used unnecessarily copious amounts in order to deliberately increase Plaintiff's exposure.  Taking the Amended Complaint as a whole and in light of this case being Plaintiff's second that alleges he was not removed from the area before staff gassed a neighboring cell – Plaintiff plausibly alleges that he is likely to suffer further retaliatory secondhand gassing.  The same is true regarding the Claim 2 retaliatory denial of treatment for Plaintiff's symptoms from chemical gas inhalation. Likewise, as to the Claim 3 allegedly dangerous cell conditions, Plaintiff here alleges that 75% of SHU cells have the same type of sharp welds, and Defendant Melvin stated "lots of inmates get cut on those welds."  AC at p. 20.  In light of (a) Plaintiff's allegations inferring that SHU cell floors are typically painted with the same slippery-when-wet enamel, (b) this is the second recent case of Plaintiff asserting that he was intentionally denied a shower curtain to make his cell more dangerous as retaliation for his filing grievances and lawsuits, and (c) the fact that Plaintiff continues to file grievances and lawsuits, Plaintiff plausibly alleges that he is likely to continue suffering future retaliation in Claim 3.[20]

VII.    *Qualified Immunity of Individual Defendants*

The individual Defendants also raise the defense of qualified immunity.  As the court stated recently in *Armijo*, qualified immunity shields "government officials from liability for

[20] For essentially the same reasons, Defendant BOP's argument that Plaintiff lacks a real and immediate danger from future harm is better addressed on a factual record.  The court denies BOP's motion to dismiss the claims for declaratory and injunctive relief against it.

38

civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted).  Qualified immunity is "immunity from suit rather than a mere defense to liability [and] it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  Whether defendants are entitled to qualified immunity is a legal question. *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007). Qualified immunity applies unless existing case law at the time of the alleged violation "established [the alleged right], not as a broad proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Reichle v. Howards*, 566 U.S. ——, 132 S. Ct. 2088, 2094 (2012) (citations and internal quotation marks omitted); *see also White v. Pauley,* No. 16-67, 580 U.S. ——, (U.S. Jan. 9, 2017) *(per curiam)* (qualified immunity applies unless there is "a case where an officer acting under similar circumstances as [the officer in question] was held to have violated the [constitutional] amendment.")

However, Defendants provide no reasoning for why they believe a reasonable prison officer would not have understood that the conduct alleged in Claims 1 through 3 would violate the Eighth Amendment.  Doc. #44 (Motion) at pp. 30-31; Doc. #61 (Reply) at p. 9.  Without any analysis or application of the caselaw that existed in 2015 to each set of facts that Plaintiff alleges, Defendants' argument is too cursory for the court to address at this time. *See, e.g., United States v. Storey,* 595 F. App'x 822, 824 (10th Cir. 2014) ("declining to pass upon cursory statements made without supporting analysis and case law," internal quotation marks omitted, quoting *Bronson v. Swensen,* 500 F.3d 1099, 1105 (10th Cir. 2007)).

VIII.   *FTCA Claim*

Defendants argue that Plaintiff has not specified the torts for which he alleges the United States is liable under the FTCA.  Doc. #44 at p. 39.  Although Plaintiff's complaint is inartfully

pled and his response brief identifies the torts only as "negligence, wrongful act or omissions," (doc. #56 at p. 18), the court is required to liberally construe Plaintiff's pleadings. The AC refers to Balsick's slamming of the slot tray on Plaintiff's hand as an "assault." AC at p. 10. The allegations regarding the dangerous cell conditions appear to sound in negligence.[21]  Under liberal construction, *pro se* plaintiffs need not specifically identify the correct legal theory so long as they plausibly allege a claim. *Hall,* 935 F.2d at 1110. The court denies the motion to dismiss the FTCA claim as to alleged assaults and negligence in the dangerous cell conditions.

Defendants further argue that to the extent Plaintiff asserts FTCA liability regarding his medical treatment, Colorado law required Plaintiff to file a certificate of review by an expert reviewed the claim. C.R.S. § 13–20–602(1).

> "[I]n every action for damages or indemnity *based upon the alleged professional negligence* of ... a licensed professional, the plaintiff's or complainant's attorney shall file with the court a certificate of review for each ... licensed professional named as a party ... within sixty days after service of the complaint" … if the "licensed professional defending the claim believes that an expert is necessary to prove the *claim of professional negligence*." *Id*. § 13–20–602(2) (emphasis added). If the court determines a certificate is required, the plaintiff must file a certificate declaring that the plaintiff … "has consulted a person who has expertise in the area of the alleged negligent conduct" and that expert "has concluded that the filing of the claim ... does not lack substantial justification." *Id*. § 13–20–602(3)(a)(I) to (II).

*Sherman v. Klenke*, 653 F. App'x 580, 594–95 (10th Cir. 2016) (emphasis original, citing *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1118 (10th Cir. 2004)). "If the court determines that a certificate is required, and the plaintiff fails to file, such failure requires dismissal of the complaint." *Sherman*, 653 F. App'x at 595 (citing C.R.S. § 13–20–602(4)). "This requirement applies whether or not an inmate is represented by counsel." *Id.*

---

[21] Defendants raise in a footnote that Plaintiff did not exhaust administrative remedies related to many of his allegations. Doc. #44 at p. 39, n. 29. Because this involves a fact issue outside of the AC's allegations, this issue is better addressed on a factual record.

As a physician's assistant, Osagie is a licensed professional within the meaning of the statute.  Plaintiff claims that Osagie should have immediately provided medical care instead of delaying or denying it.  If Plaintiff intended this as a basis for the FTCA claim, it sounds in professional negligence and would require an expert witness.  Thus the court finds a certificate of review is necessary for such a claim.  Plaintiff has not filed such a certificate within the time that the statute required.  If Plaintiff intends to seek FTCA liability against the United States regarding any of his medical treatment, Plaintiff shall file a motion to amend the Amended Complaint to specify the conduct in his medical care that he alleges for the FTCA claim and shall simultaneously file the requisite certificate of review regarding that claim.

IX.      *Notice to Plaintiff Regarding Potential Future Sanctions.*

Notwithstanding that Plaintiff plausibly alleges claims in the Amended Complaint, the court *sua sponte* takes judicial notice of several facts from its records.  Since December 2005, Plaintiff has filed 15 actions in this court.  Three remain open.  None of the twelve closed cases resulted in judgment in favor of Plaintiff.  Plaintiff alleges he "won" an appeal of one of those cases.  However, in that case the Tenth Circuit affirmed the judgment against Plaintiff, except to vacate "the court's recharacterization of Mr. Custard's action as a § 2255 motion" without giving prior notice to enable Plaintiff to withdraw or amend his claims.  *United States v. Custard*, 193 F. App'x 770, 771–72 (10th Cir. 2006).  In the AC, Plaintiff also lists 14 additional cases that he filed in other courts prior to 2005, all of which Plaintiff admits he lost, does not recall the outcome, or "won/deserved to."  AC at p. 29.[22]  In short, Plaintiff has filed at least 29 civil rights cases– not including all of his appeals to the Tenth Circuit – against prison staff, and it appears

---

[22] In the sole case filed in another court that Plaintiff alleges he "won/deserved to" and "won" the appeal, *Custard v. Robinson, et al.,* "Civ. 99-3285, N.D. Ga, No. 03-15514.EE, 11th Circuit," AC at p. 29, the Eleventh Circuit affirmed the trial court without issuing an opinion.  *Custard v. Robinson,* 129 F. App'x 597 (Table) (11th Cir. Jan. 14, 2005).  Plaintiff's description that he "won/deserved to" in the trial court leaves unclear but suggests that he did not prevail.

that at best, in Plaintiff's opinion he may have won a judgment in his favor in only one case from the Northern District of Georgia.

The court takes further judicial notice that in this case, Plaintiff alleges many Eighth Amendment and First Amendment theories that although alleging different factual episodes, appear to be substantially similar to claims that the court dismissed in earlier cases. *See, e.g., Custard v. Allred,* Civ. 13-2296-REB-CBS and *Armijo*, Civ. 15-448-REB-CBS. Plaintiff now adds allegations for the subjective element that even Plaintiff recognizes sound surprising or unbelievable, albeit asserting that they are nonetheless true.

In light of what appears to be a continuous (or growing) pattern in his lawsuits, Plaintiff shall take note that if the court finds "a party has engaged in a pattern of litigation activity which is manifestly abusive," *In re Winslow*, 17 F.3d 314, 315 (10th Cir. 1994) (*per curiam*) (internal quotations omitted), the court may recommend imposing additional filing restrictions or some other effective form of sanctions. *See also Van Sickle v. Holloway,* 791 F.2d 1431, 1437 (10th Cir. 1986) (imposing monetary sanction and filing restriction). "[F]ederal courts have the inherent power pursuant to 28 U.S.C. § 1651 to impose filing restrictions on abusive litigants." *Jiron v. Colorado*, 343 F. App'x 296, 297 (10th Cir. 2009). In *Jiron,* this court had imposed filing restrictions on a *pro se* prisoner, requiring him to obtain the court's prior approval, based on information that the sanction order required, before filing further pro se civil complaints. When the district court enforced the filing restrictions by dismissing the plaintiff's unapproved *pro se* action, the Tenth Circuit found no error, noting the plaintiff "has filed no fewer than nineteen civil actions in the Colorado district court." *Id.* In *Winslow*, the Tenth Circuit found that where *pro se* litigants brought substantially similar allegations in seventeen actions and

ignored admonitions to follow the court's local rules, the litigants should be restricted from filing further actions *pro se* unless they first obtained the court's approval.  *Winslow,* 17 F.3d at 316.

Plaintiff shall take note that if he continues to file civil rights actions against prison officers alleging substantially similar theories, the court may in the future recommend requiring Plaintiff to show cause why he should not be sanctioned, including monetary sanctions and additional filing restrictions.

CONCLUSION

The court RECOMMENDS GRANTING Defendants' motion to dismiss as to the following claims, and dismissing without prejudice:

- Claim One against Balsick for excessive force in shattering the plexiglas barrier;

- Claim One against Balsick and MacGrath for labeling Plaintiff as a snitch;

- Claim Two against the Doe Defendants 1-10 to the extent Plaintiff alleges that they failed to remove him from his cell before gassing the neighboring cell;

- Claim Two against Dr. Santini; and

- Claim Three for delay or denial of medical care in Osagie's refusal to provide asthma inhalers, bandaids, and not permitting Plaintiff to see Dr. Santini for removal of his stitches.

The court DENIES the motion to dismiss as to the following alleged claims:

- Claim One against Balsick for excessive force in slamming a slot door on Plaintiff's fingers;

- Claim One against Balsick, Haygood, MacGrath and Melvin for deliberate indifference to Plaintiff's need for medical care for his left fingers after the slot door incident;

- Claim Two against Martin for excessive force in not removing Plaintiff before discharging chemical gas into a neighboring cell;

- Claim Two against the Doe Defendants who discharged excessive gas to intentionally increase Plaintiff's secondhand exposure;

- First Amendment retaliation in Claim 2 against Martin, Does 1-10 (or whichever of the Does discharged allegedly copious amounts of chemical gas), and Osagie;

- Claim Three for refusing to reassign Plaintiff to another cell, knowing the substantial risk of harm from the shower welds and uncurtained shower: Hess and Melvin;

- Claim Three for refusing to provide a shower curtain to Plaintiff: Behle, Espinoza MacGrath and Martin;

- Claim Three for refusing to fix the sharp weld barbs: Belter, McMullen;

- Claim Three for delay in medical care: Osagie;

- First Amendment retaliation in Claim 3 against Behle, Belter, Espinoza, Hess, MacGrath, and Melvin;

- Individual Defendants' qualified immunity;

- Declaratory/injunctive relief claims against BOP associated with the remaining Claims 1-3; and

- FTCA claim against United States.

This recommendation will result in narrower claims going forward against all named Defendants who remained in the case after the summary dismissal order (Doc. #19), except Defendant Santini will be dismissed entirely.

The court FURTHER ORDERS that within 10 days of this order, BOP shall file Mr. Haygood's last known address (as Level 3 restricted) for the Marshals to attempt service.

The court FURTHER ORDERS that within 60 days of Judge Blackburn's ruling on any objections to this order and recommendation (or, if no objections are filed, within 60 days after the time in which to object passes), Plaintiff shall file a motion to amend the AC with a proposed second amended complaint to (a) identify the individuals whom he named as Doe Defendants and MacGrath, containing sufficient information to enable the Marshals to serve these Defendants; (b) identify whether Plaintiff asserts FTCA liability against the United States for any of his medical care, and if so, which conduct in particular; and (c) allege any additional facts or law that would cure the deficiencies of his dismissed claims as noted in Doc. #19 and this order and recommendation.  At the same time as his motion to amend, Plaintiff shall also file the certificate of review required by C.R.S. § 13–20–602(1) as to any FTCA claim relating to his medical care by Osagie.

The court FURTHER ORDERS that Plaintiff's motion (doc. #76) for a ruling on the motion to dismiss is denied as moot.

ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate

Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated: January 13, 2017.

BY THE COURT:

*s/Craig B. Shaffer*
United States Magistrate Judge